Attachment A

AFFIDAVIT

I, James P. Hisgen, being duly sworn, depose and state as follows:

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI"), and am currently assigned to an economic crime squad of the Boston Field Office. I have been a Special Agent of the FBI since January, 2005. During my time with the FBI, I have received training in the investigation and prosecution of white collar crimes, including mail fraud, wire fraud, and bank fraud in violation of Title 18, United States Code, §§ 1341, 1343 and 1344, as well as other financial crimes. I also recently attended an FBI conference on money laundering and terrorist financing. I have reviewed the facts of this case with more experienced FBI Special Agents. Prior to joining the FBI, I spent approximately 4 ½ years as an Assistant Portfolio Manager at Hawthorn-PNC Advisors, which, during my tenure, became Veritable LP.

2. As indicated below, I am of the opinion that there is probable cause to believe that Angelo Martignetti, Jr. ("Martignetti"), who was then an employee of a bank insured by the Federal Deposit Insurance Corporation ("FDIC") is guilty of embezzling, purloining and willfully misapplying monies and funds

1

of such bank and entrusted to the custody and care of such bank, in violation of Title 18, United States Code, §656. The information contained herein is based on my personal knowledge of this investigation or, where indicated, on information that I have received from others. This Affidavit is submitted for the limited purpose of seeking a complaint against Angelo Martignetti, Jr. and authority to arrest him pursuant to that complaint. As such, I have not included every fact known to me regarding the investigation described herein. Instead, I have related only those facts which I believe are necessary to establish the requisite probable cause.

3. On approximately April 8, 2005, law enforcement received information concerning possible criminal conduct from Eastern Bank ("the bank"), located in Lynn, Massachusetts. According to the information initially provided by the bank, during a routine internal payroll audit in 2005, one of the staff auditors questioned a manual entry made to the bi-weekly payroll expense account. Eastern Bank uses a service provider to assist with their payroll function. As a result, typically, normal payroll entries are automatically interfaced with the bank's general ledger system. Manual entries are sometimes done as exceptions to the general practice, but part of the routine audit function is to attempt to verify manual entries and to evaluate the internal controls over the process. In reviewing the

questioned manual entry, the bank found that the offsetting credit was a deposit to the personal checking account of Angelo Martignetti, Jr.

4. In March 2005, Martignetti was a payroll manager at the bank. He had been hired as a teller on November 30, 1998 and transferred to the Human Resource Department, working in the payroll area, in February of 2001.

5. Once they found that the credit on the questioned transaction had been a deposit to Martignetti's personal account, the audit personnel expanded their inquiry. They found a pattern of inappropriate deposits to Martignetti's checking account, beginning on approximately June 12, 2002, with the total amount of misappropriated funds totaling approximately $263,679.

6. On March 24, 2005, representatives of the bank interviewed Martignetti and asked him about the fact that credit offsets for payroll adjustments were being deposited to his personal checking account. According to the bank, after several minutes and some further questions, Martignetti stated that he had a problem with OxyContin and that it had developed into a habit he could not afford on his regular pay. The bank terminated his employment and referred the matter to law enforcement.

7. Thereafter, on May 2, 2005, I went to Eastern Bank and spoke with various personnel assigned to Internal Audit,

including Cheryl Leonard, Vice-President for Internal Audit, who had been present during the March 24, 2005 interview of Martignetti. She reiterated what had happened during the interview of Martignetti. She stated that they had showed him a print out from a general ledger audit which reflected the initial questioned transaction and identified a debit from a bank expense account and a corresponding deposit to his personal checking account. According to Leonard, after seeing this documentation, Martignetti admitted that he had taken money from the bank.

8. During the meeting with Eastern Bank personnel, I was provided with copies of the records which documented the debits from the banks' accounts and the deposits to Martignetti's checking account. All told, there were approximately 168 such transactions from June 2002 through March 23, 2005. Based on my review, the debits and credits began with smaller amounts, with the first known such transaction being for $350.00 and increased over time, with the final deposit amount being $1,862.46. Based on the records provided to me by the bank, the amount of the funds now known to have been misappropriated by Martignetti during the relevant time period totals $263,678.69.

9. On May 4, 2005, FBI Special Agent John Keelan and I went to Martignetti's apartment to interview him. Martignetti agreed to speak with us. During the ensuing conversation, Martignetti told us that he had taken money from Eastern Bank and

used some of the money to purchase drugs.

10. According to the information provided by Martignetti, to get control of the funds, he essentially created general ledger transactions. He prepared two slips: one a debit to a bank expense account (mostly account number 54110 which was a salary expense account titled "Full Time Salary and Wages") and the other a credit to his Eastern Bank personal checking account (account number 401586631). Martignetti told us that he would have the debit signed off on by a supervisor. According to the bank, these supervisors understood the debits to be legitimate payroll adjustments for various employees. Martignetti would then deposit the corresponding funds to his own account by submitting the debit and credit slips to the Item Processing Department. He was not specific about how much money he had taken, but thought that the bank's calculation as to the amount of funds was probably accurate. He did not know the exact amount he had spent to purchase drugs, but stated that he had used most of the money for drugs, predominantly OxyContin. He claimed to have spent all of the money he took from the bank, even stating that he was going to have move out of his apartment at the end of the month because he could no longer afford it.

## CONCLUSION

11  Based on the foregoing, it is my conclusion that there is probable cause to believe that Angelo Martignetti, Jr. has

embezzled funds from an FDIC insured bank in violation of 18 U.S.C. § 656.

*James P. Hisgen*
James P. Hisgen
Special Agent,
Federal Bureau of Investigation

Sworn to and subscribed before me this 5th day of May, 2005. @ 5:10 PM

*Marianne B. Bowler*
MARIANNE B. BOWLER
U.S. MAGISTRATE JUDGE